UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TOMMY DEAN THOMASON,

           Petitioner,

v.                                CASE NO. 03-CV-70363-DT
                                HONORABLE NANCY G. EDMUNDS

DAVID JAMROG,

           Respondent.
_____/

## OPINION AND ORDER DENYING PETITIONER'S APPLICATION FOR THE WRIT OF HABEAS CORPUS AND MOTION TO STRIKE

This matter is pending before the Court on petitioner Tommy Dean Thompson's pro se habeas corpus petition under 28 U.S.C. § 2254 and Petitioner's motion to strike two volumes of trial transcript. The habeas petition challenges Petitioner's state conviction for two counts of first-degree criminal sexual conduct. The conviction arose from charges that Petitioner sexually penetrated his eleven-year-old stepdaughter. Having reviewed the pleadings and record, the Court concludes that Petitioner's claims lack merit or are procedurally defaulted. Accordingly, his habeas petition and motion to strike will be denied.

## I. Background

### A. The Facts as Alleged at Trial

#### 1. Prosecution Witnesses

The complaining witness was seventeen years old at the time of Petitioner's trial. She testified that, one day in August of 1992 when she was eleven years old, she was at home because she had a strep throat. Petitioner asked her to come into his bedroom and lie on the bed.

He took off her nightgown and underwear, placed a blanket over her head, and began to kiss her stomach. Then he kissed her vaginal area and put his penis inside her. She blacked out. When she woke up, Petitioner was hugging her and telling her that he loved her and that she was his baby girl. She crawled out of bed after Petitioner fell asleep. Her stomach hurt, and she felt sticky. There was blood on her underwear. She hid the underwear in a dresser drawer and ultimately hid it in a field behind their house. She did not tell anyone what Petitioner had done to her because she was afraid that her parents would get a divorce and that the family would have a hard time getting by without him. A couple of days after the incident, Petitioner and her aunt took her to the hospital because she had stomach pains. She did not permit the medical staff to perform a pelvic examination on her because Petitioner had told her they would know what happened if she had the examination.

Petitioner did other things to her that she did not like. On one such occasion in March of 1995 when she was fourteen, Petitioner took her for a ride in his truck and tried to convince her to go to a hotel with him. She declined the invitation, but he grabbed her breast, and she had to pry his hand away. The next day, she told a teacher what had happened. The teacher and a counselor called Protective Services and her mother. Her mother then made Petitioner move out of the house, and they reported the incident to the police. Petitioner pleaded no contest to second-degree criminal sexual conduct for the incident in the truck, but she continued to have contact with him and wrote to him while he was in prison.

She gradually remembered details about the other incidents when Petitioner sexually abused her. In February of 1997, she informed her younger sister and her mother about the incident in Petitioner's bedroom in August of 1992. She decided to proceed with a prosecution because she realized what Petitioner had done to her, and she was angry with him.

Laura Thomason was Petitioner's former wife and the mother of the complainant. She

testified that, when the complainant was between the ages of nine and fourteen, the children sometimes complained about being left alone with Petitioner. The complainant protested the most. In March of 1995, Ms. Thomason was called to the complainant's school where she first learned about Petitioner's inappropriate conduct toward their daughter in his truck. Later that day, she asked Petitioner whether he had grabbed the complainant's breasts. Petitioner responded that he had merely asked the complainant to show him her breasts. Another time, Petitioner told her that he had a right to the complainant's virginity before anyone else. On still another occasion, he informed her that he had engaged in sexual activity with the complainant.

Ms. Thomason began to tape her conversations with Petitioner. She delivered two of the tapes to the police, but destroyed several other incriminating tapes because she loved Petitioner and did not want him to go to prison for the rest of his life. She was satisfied when Petitioner was sentenced to three to fifteen years in prison for the charges that arose from the incident in the truck in March of 1995. In February of 1997, the complainant informed her that Petitioner had raped her in 1992.

Ms. Thomason recalled the time in August of 1992 when the complainant went to the hospital for abdominal pains. By the time Ms. Thomason arrived at the hospital, the complainant was hysterical and refused to permit the doctor to perform a pelvic examination. The source of the complainant's stomach pain was never determined.

In retrospect, Ms. Thomason thought that there had been signs of unusual activity. For example, the complainant stopped kissing Petitioner good night. She sometimes woke up screaming, and she began to wear clothes under her nightgown.

Therapist John Neumann testified as an expert in the treatment of sex offenders and individuals who have been sexually abused. He opined that it was not unusual for a person to forget details of a sexual assault and to delay disclosing sexual abuse by a family member.

According to him, forgetfulness is an unconscious survival technique and it usually occurs when the individual has been repeatedly victimized.

Tommy Thomason, Jr., was Petitioner's son and the complainant's stepbrother. He recalled a time when Petitioner and the complainant went in the bathroom and he heard the complainant screaming. He and his other sister tried to enter the bathroom, but Petitioner came out, ushered them into a bedroom, and locked the door. He later heard Petitioner and the complainant in the living room where the complainant was crying.

On another day, the complainant asked him to go into the woods with her. The complainant threw away some underwear that appeared to have blood on it. She said that she did not want their parents to get angry with her for spilling Kool Aid on her underwear. He did not say anything about the incident until a few months before trial when his mother asked him if he could remember anything. Until then, he had forgotten about the incident.

Anthony Reaves testified that he had spent some time in prison with Petitioner and that Petitioner had asked for legal advice about the pending charges. Reaves recalled Petitioner saying that the incident occurred in the bedroom. Petitioner was in bed with the complainant and she was mistakenly penetrated after a blanket was placed over her head. She suffered a little blood loss.

Reaves admitted that he was incarcerated for criminal sexual conduct and that he had been stealing since he was twelve years old. He stated that he chose to come forward with information about Petitioner because it was the right thing to do.

### 2. The Defense Witnesses

Detective Dennis Jelley testified that Laura Thomason never told him that Petitioner had confessed to having had intercourse with their daughter. Mary Kay Neumann testified that she was John Neumann's wife and a social worker in the Child Sexual Assault Unit of the Oakland

County Prosecutor's Office. She interviewed the complainant in 1995 and again in February of 1997. In 1995, the complainant did not mention that Petitioner had sexually penetrated her in 1992. The 1992 incident first came to light in 1997.

Petitioner testified that he was currently serving time for second-degree criminal sexual conduct arising from an incident with the complainant in the pending case. He denied ever performing oral sex on the complainant or attempting to insert his penis in her vagina, and he stated that he never informed his former wife that he had sex with their daughter or intended to take her virginity. He also denied locking his other children in a room, confessing what he had done, stating that he wanted to take the complainant to a hotel, or grabbing her breast in his truck in 1995. He claimed that the allegations against him were absolutely false and that he would never do those things to his daughter. It was his position that the complainant made up the allegations to get him out of the house because he wanted her to break up with her boyfriend. He thought that her allegations about him were the result of vindictiveness or spitefulness or perhaps fear that he would retaliate against her when he got out of prison.

### B. The Verdict, Sentence and Direct Appeal

On January 15, 1998, the jury found Petitioner guilty, as charged, of two counts of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b(1)(a) (sexual penetration of a person under thirteen years of age). The trial court sentenced Petitioner to concurrent terms of twenty-five to fifty years for each count.

On appeal from his conviction, Petitioner argued through counsel that his trial attorney failed to investigate and present expert rebuttal testimony and also provided ineffective assistance at sentencing. In a *pro se* supplemental brief, Petitioner argued that he was denied counsel for a ten-week period before trial and that his trial attorney was biased against him. The claims presented on direct appeal constitute habeas claims I through IV. The Michigan Court of

Appeals found no merit in those claims and affirmed Petitioner's convictions in an unpublished, *per curiam* opinion. *See People v. Thomason*, No. 209420 (Mich. Ct. App. Sept. 19, 2000). Petitioner raised the same claims in the Michigan Supreme Court, which denied leave to appeal on May 3, 2002, because it was not persuaded to review the questions. *See People v. Thomason*, 466 Mich. 861; 643 N.W.2d 233 (2002).[1]

### C. Collateral Proceedings in State Court and the Habeas Corpus Petition

On February 10, 2003, Petitioner raised several new claims in a motion for relief from judgment. Four days later, Petitioner filed his habeas corpus petition in this Court. The Court dismissed the petition without prejudice on April 30, 2003, because Petitioner's motion for relief from judgment was still pending in the trial court. On September 3, 2003, the trial court denied Petitioner's motion for relief from judgment on the ground that Petitioner raised, or could have raised, all his claims on appeal.

In an application for leave to appeal the trial court's decision, Petitioner raised issues, which now comprise habeas claims V through X. The Michigan Court of Appeals denied leave to appeal because Petitioner failed to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. Thomason*, No. 251210 (Mich. Ct. App. Mar. 11, 2004). On October 25, 2004, the Michigan Supreme Court denied leave to appeal for the same reason. *See People v. Thomason*, 471 Mich. 897; 688 N.W.2d 88 (2004) (table).

Petitioner then returned to this Court and filed an amendment to his habeas corpus petition. His claims, as numbered and set forth in the body of his initial habeas petition and the amendment, are:

---

[1] Justice Marilyn Kelly voted to grant leave to appeal for the purpose of determining whether the trial court's failure to comply with the procedural requirements for waiving counsel was harmless error.

I.      Petitioner was denied the assistance of counsel for ten weeks prior to trial.

II.     Petitioner's trial attorney was biased.

III.    Defense counsel failed to investigate and present expert rebuttal testimony.

IV.     Defense counsel provided ineffective assistance at sentencing.

V.      Petitioner's right to represent himself was violated.

VI.     The trial court failed to address Petitioner's motion for a defense expert.

VII.    Petitioner was denied the right to the assistance of counsel at all critical stages.

VIII.   Trial counsel failed to present available medical records as exhibits during trial.

IX.     Trial counsel failed to present an alibi defense.

X.      Petitioner was denied the right to effective assistance of appellate counsel.

Respondent argues in a responsive pleading that most of Petitioner's claims are procedurally defaulted, and that the state court did not unreasonably apply Supreme Court precedent when adjudicating Petitioner's other claims.

## II.  Standard of Review

Petitioner is not entitled to the writ of habeas corpus unless he can show that the state court's adjudication of his claims on the merits–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409.

## III. Discussion

### A. The Lack of Representation for Ten Weeks before Trial

Petitioner represented himself for about ten weeks before his trial commenced. He asserts in his first and seventh claims that he was denied his constitutional right to appointment of counsel during this period. The Michigan Court of Appeals reviewed this claim on the merits and determined that the trial court gave Petitioner what he asked for: the right to represent himself. The court of appeals went on to say that, although the trial court should have advised Petitioner of the dangers and disadvantages of self-representation, the trial court's error was harmless because Petitioner was presented by counsel at trial and there was not a reasonable possibility that the error contributed to Petitioner's conviction.

#### 1. The Right to Counsel

A defendant in a criminal case has a right to the assistance of counsel in his defense. U.S. CONST. amend. VI. The right to counsel "is a fundamental component of our criminal

justice system," because lawyers are the means through which the defendant's other rights are secured. *United States v. Cronic*, 466 U.S. 648, 653 (1984).

The right to counsel attaches "at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty." *Rothgery v. Gillespie County, Texas*, __ S. Ct. __, __, No. 07-440, 2008 WL 2484864, at *3 (U.S. June 23, 2008). The complete absence of counsel at a critical stage of trial renders the trial unfair and presumptively unreliable without a specific showing of prejudice. *Cronic*, 466 U.S. at 658-59 & 659 n.25.

The Supreme Court has defined "critical stages" as "proceedings between an individual and agents of the State (whether 'formal or informal, in court or out,' see *United States v. Wade*, 388 U.S. 218, 226 (1967)), that amount to 'trial-like confrontations,' at which counsel would help the accused 'in coping with legal problems or . . . meeting his adversary.'" *Rothgery*, 2008 WL 2484864, at *12 n.16 (quoting *United States v. Ash*, 413 U.S. 300, 312-13 (1973)). The pretrial period is a critical stage for Sixth Amendment purposes, *Powell v. Alabama*, 287 U.S. 45, 57 (1932), "because it encompasses counsel's constitutionally imposed duty to investigate the case." *Mitchell v. Mason*, 325 F.3d 732, 743 (6th Cir. 2003).

### 2. Standby Counsel

Petitioner was represented by counsel from the time of his arraignment until ten weeks before trial, when the trial court permitted Howard Arnkoff to withdraw as counsel. For the ten weeks preceding trial, Mr. Arnkoff served as an advisor to Petitioner. Although standby counsel generally does not satisfy a defendant's Sixth Amendment right to counsel, some courts have found that it can do so when counsel actively and substantially assists the defendant. *King v. Bobby*, 433 F.3d 483, 490 (6th Cir.) (comparing *United States v. Oreye,* 263 F.3d 669, 672 (7th Cir. 2001), with *United States v. Davis*, 269 F.3d 514, 520 (5th Cir. 2001), and *United States v.*

*Taylor*, 933 F.2d 307, 312 (5th Cir. 1991)), *cert. denied*, __ U.S. __, 127 S. Ct. 506 (2006).[2]

Attorney Arnkoff appeared at a court hearing with Petitioner on November 14, 1997. He stated that he had seen Petitioner briefly the day before. Mr. Arnkoff appeared in court with Petitioner three additional times during November and December of 1997. On two of those occasions (November 19, 1997, and November 26, 1997), both Arnkoff and Petitioner argued in opposition to the prosecutor's motions. And at the hearing on November 26, 1997, Mr. Arnkoff made a request in Petitioner's behalf to adjourn the trial date so that Petitioner could properly prepare for trial and file additional motions. Because attorney Arnkoff substantially and actively helped Petitioner during the ten-week period during which he served as standby counsel, Petitioner arguably was not denied his constitutional right to the assistance of counsel.

### 3. Waiver of the Right to Counsel

Even if standby counsel did not satisfy Petitioner's Sixth Amendment right to counsel, the Court believes that Petitioner voluntarily and intelligently waived his right to counsel. Waiver is "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). For an accused person to waive his constitutional right to counsel, he

> must 'knowingly and intelligently' forgo those relinquished benefits. Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'

*Faretta v. California*, 422 U.S. 806, 835 (1975) (citations omitted).

"To ensure that a defendant's waiver is made with eyes wide open, a judge must

---

[2] The Sixth Circuit declined to decide in *King v. Bobby* whether standby counsel can satisfy a defendant's right to counsel because the petitioner's attorney did not participate at all in the case after he was designated as standby-counsel.

thoroughly investigate the circumstances under which the waiver is made." *Fowler v. Collins*, 253 F.3d 244, 249 (6th Cir. 2001) (citing *Von Motke v. Gillies*, 332 U.S. 708 (1948)). Less rigorous warnings are required before trial than at trial "because, at that stage, 'the full dangers and disadvantages of self-representation . . . are less substantial and more obvious to an accused than they are at trial.'" *Iowa v. Tovar*, 541 U.S. 77, 90 (2004) (quoting *Patterson v. Illinois*, 487 U.S. 285, 299 (1988)).

Courts must indulge in every reasonable presumption against waiver of the right to counsel, whether at trial or during a critical stage of pretrial proceedings." *Brewer v. Williams*, 430 U.S. 387, 404 (1977). However, "the information a defendant must have to waive counsel intelligently will 'depend, in each case, upon the particular facts and circumstances surrounding that case.'" *Tovar*, 541 U.S. at 92 (quoting *Johnson v. Zerbst*, 304 U.S. at 464); *see also Wilson v. Parker*, 515 F.3d 682, 694-95 (6th Cir. 2008) (explaining that the extent to which a court must probe into the elements of a valid waiver of counsel varies from case to case).

"[T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances -- even though the defendant may not know the *specific detailed* consequences of invoking it." *United States v. Ruiz*, 536 U.S. 622, 629 (2002) (emphasis in original). A waiver is valid if it is "made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." *Von Motke*, 332 U.S. at 724.

### 4. The State Court Decision

The trial court never advised Petitioner on the record of the dangers and disadvantages

associated with self-representation.[3]  The trial court also did not make any findings as to whether Petitioner voluntarily and intelligently waived counsel.

The Michigan Court of Appeals concluded that the trial court erred in not advising Petitioner on the record of the dangers and disadvantages of self-representation.  While this Court agrees that the trial court was remiss in failing to warn Petitioner of the risks associated with self-representation, the following section demonstrates that Petitioner waived his right to counsel with eyes open.  Therefore, the trial court's omissions were excusable.

### 5.  Petitioner's Conduct During the Ten Weeks before Trial

After a pretrial conference on September 5, 1997, Petitioner demanded to be sent back to Carson City where he was incarcerated.  This made it very difficult for his attorney to visit him.  And in a letter to attorney Arnkoff on October 8, 1997, Petitioner wrote, "I do not want you to represent me at my coming trial."  He also stated that he would not allow Arnkoff "or any tramp attorney" to deny him his right to a fair trial.  The letter concludes:

> I will prove my innocence without your aid.  Therefore file a motion to withdraw.  There is a major breakdown in our attorney client relationship.  Thank you for your brief efforts, but no thanks.

On October 19, 1997, Petitioner informed the trial court by letter that he had decided to defend himself.  Although he asked for co-counsel to help him, the trial court made it clear in a subsequent order dated October 30, 1997, that Mr. Arnkoff would act only as an advisor to Petitioner.  The order stated that the court would not appoint another attorney for Petitioner and that he would be acting *in pro per* unless he retained counsel.

At a hearing on November 14, 1997, the trial court asked Petitioner whether he was still

---

[3]  Petitioner was not present in court when attorney Howard Arnkoff orally moved to withdraw from the case and when the trial court announced that Petitioner would have to represent himself.  (Tr. Oct. 29, 1997, at 2.)

proceeding *in pro per*. Petitioner responded, "Yes, I am." He then proceeded to deal with several pretrial issues. When he complained about having to use Arnkoff as his advisor, the trial court said, "Don't use him. You don't have to use him." Petitioner replied, "I'm not going to." He later requested the assistance of a paralegal at trial, but the trial court denied his request. (Tr. Nov. 14, 1997, at 2-3 and 31.)

On November 26, 1997, Petitioner requested an adjournment in the trial date because he needed additional time to gather evidence and issue subpoenas. He subsequently filed more *pro se* motions.

Finally, on the first day of trial (January 12, 1998), Petitioner acknowledged that he was representing himself. He asked to have Mr. Arnkoff serve as hybrid counsel, but the trial court said that there was no such thing as hybrid counsel and that Mr. Arnkoff was or was not his attorney. Petitioner replied, "Then he's not my attorney," and he proceeded to discuss medical records, which he had requested. (Tr. Jan. 12, 1998, at 2-3.)

### 6. Summary

As in *Faretta*, Petitioner clearly and unequivocally declared to the trial court that he wanted to represent himself and did not want Mr. Arnkoff, who was his second appointed attorney, to represent him. Arnkoff was prepared for trial,[4] and the record shows that Petitioner

---

[4] In *James v. Brigano*, 470 F.3d 636 (6th Cir. 2006), the Sixth Circuit affirmed the district court's grant of habeas relief where the trial court did not explain the risks and dangers in proceeding *pro se*. The trial court in that case also did not ensure that the defendant's waiver of counsel was knowing and voluntary, and the court did not make an explicit finding that the defendant's waiver was knowing and intelligent. While the trial court in Petitioner's case made the same errors, Mr. James was attempting to deal with (1) an attorney who admitted that he was unprepared for trial and (2) a trial court, which was determined to proceed with trial regardless of the attorney's unpreparedness. The Sixth Circuit determined that James' waiver of the right to counsel was not knowing and intelligent because "the choice between unprepared counsel and self-representation is no choice at all." *Id*. at 644. Petitioner's attorney, unlike Mr. James' attorney, was prepared for trial.

was literate, competent, and knowledgeable. He obviously knew the advantages of having counsel and the disadvantages of representing himself, for he was serving a sentence for criminal sexual conduct in another case and he was actively involved in this case.

Petitioner knew the charges against him, and he acknowledged the maximum penalty for the charges when he stated in his letter to Howard Arnkoff that he was facing two life sentences and wanted Arnkoff to withdraw as counsel. The record indicates that Petitioner was aware of possible defenses to the charges. He claimed to have alibi witnesses, he requested the complainant's medical records, and he filed a *pro se* motion for an expert witness. Although he wanted co-counsel, something to which he was not entitled, "it is not an unreasonable application of *Faretta* to find a waiver of counsel where a defendant with a history of switching attorneys knew of his right to counsel, knew the charges and potential penalties, and rejected appointed counsel while asserting that he did not want to represent himself." *Wilson v. Parker*, 515 F.3d at 695.

Petitioner demonstrated through his conduct that he was waiving his right to counsel with eyes open and that his waiver was voluntary and knowing. Under the circumstances, the trial court's failure to investigate and advise Petitioner on the record of the risks and disadvantages of self-representation was excusable.

Although the Michigan Court of Appeals incorrectly concluded that the denial of counsel was harmless error,[5] this Court cannot grant habeas relief simply because a state court ruling was

---

[5] *See Cronic,* 466 U.S. at 659 n.25 ("The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding."); *accord Benitez v. United States*, 521 F.3d 625, 630 (6th Cir. 2008) ("A violation of a defendant's right to counsel at a critical stage is a structural error, and is therefore not subject to an analysis of whether the error was harmless or prejudicial."); *Olden v. United States*, 335 F.3d 561, 565 (6th Cir. 2000) (stating that "[p]rejudice is presumed . . . when counsel is completely denied due to absence at a critical stage of a trial").

erroneous or incorrect. *Williams v. Taylor*, 529 U.S. at 409-11. The state appellate court's ultimate decision to deny relief was reasonable. Its rejection of Petitioner's claim did not contradict Supreme Court decisions on the right to counsel and waiver of the right to counsel. The Court therefore declines to grant relief on Petitioner's first and seventh claims. The "highly deferential standard for evaluating state-court rulings" demands that this Court give the state court's decision the benefit of the doubt. *Bell v. Cone*, 543 U.S. 447, 455 (2005).

### B.  Trial Counsel's Alleged Bias

The second habeas claim alleges that Petitioner's trial attorney, Howard Arnkoff, was biased. The basis for this claim is Mr. Arnkoff's comment at the hearing on his motion to withdraw as counsel that Petitioner would not be happy with any lawyer. Arnkoff also stated that Petitioner had disparaged the trial court and that he (Arnkoff) did not care whether Petitioner had to represent himself. (Tr. Oct. 29, 1997, at 2-4.)

An attorney's "function is to assist the defendant, and hence counsel owes the client a duty of loyalty . . . ." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Attorney Arnkoff did not breach the duty of loyalty when he stated that Petitioner would not be happy with any lawyer appointed to represent him. Arnkoff was aware of Petitioner's letter informing Arnkoff that he did not want Arnkoff "or any tramp attorney" representing him. Arnkoff nevertheless agreed to serve as advisory counsel to Petitioner in the weeks before trial, and he vigorously represented Petitioner at trial. Petitioner has failed to show that Mr. Arnkoff abandoned his role as an advocate or breached his duty of loyalty.

### C.  Failure to Investigate

Petitioner alleges next that attorney Howard Arnkoff should have presented an expert witness to rebut John Neumann's testimony that it is not unusual for victims of sexual abuse to repress memories. The Michigan Court of Appeals adjudicated this claim on the merits and held

that Petitioner had not overcome the presumption that defense counsel's conduct was objectively reasonable. The court of appeals pointed out that Petitioner dismissed his attorney before he could investigate or pursue the defense.

### 1. *Strickland*

To prevail on a claim of ineffective assistance of counsel, Petitioner must demonstrate that his attorney's "performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. at 687. An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. Although there is no constitutional right to the appointment of an expert witness at state expense, *Panetti v. Quarterman*, __ U.S. __, __, 127 S. Ct. 2842, 2872 (2007), "[w]here there is substantial contradiction in a given area of expertise, it may be vital in affording effective representation to a defendant in a criminal case for counsel to elicit expert testimony rebutting the state's expert testimony." *Knott v. Mabry*, 671 F.2d 1208, 1212-13 (8th Cir. 1982).

A deficient performance is prejudicial, however, only if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington,* 466 U.S. at 687. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

### 2. Application

Petitioner's appellate attorney has stated in an affidavit that Petitioner's trial attorney,

Howard Arnkoff, admitted to him that he did not produce an expert witness to rebut the State's expert witness because he did not know of such an expert and did not think the testimony of the state's expert was relevant or important. Petitioner, however, named an expert witness in a *pro se* motion seeking appointment of an expert witness. Furthermore, Petitioner's appellate attorney located a psychologist who was willing to testify that John Neumann's memory-repression theory was "woefully ill-informed" and inapplicable because the complainant claimed that only one episode of criminal sexual conduct occurred. The psychologist also was willing to testify that Mr. Neumann, who was the complainant's counselor, likely influenced the complainant to have a false memory of Petitioner penetrating her. The Court concludes from these facts that Mr. Arnkoff's failure to investigate the possibility of calling an expert witness to rebut John Neumann's testimony constituted deficient performance.

The record, however, indicates that the deficient performance did not prejudice Petitioner's defense. Mr. Arnkoff elicited testimony from Mr. Neumann that Neumann probably had been fooled by some of his clients in the past and that young people can lie and have a variety of reasons for fabricating their accusations. Defense counsel also attempted to expose a perceived weakness in Neumann's theory of repressed memories by pointing out that the complainant did not readily disclose the 1992 incident even after she should have felt secure in doing so.

Furthermore, although the case was largely a credibility contest, the complainant's testimony was corroborated by the testimony of her stepbrother, who testified that the complainant once threw away some bloody underwear. In addition, there was evidence that Petitioner had admitted to his wife and to a fellow inmate that he sexually penetrated the complainant. There was additional evidence that Petitioner pleaded no contest in 1996 to second-degree criminal sexual conduct involving the same victim. The jury was permitted to

consider this evidence for the limited purpose of judging Petitioner's credibility in the case for which he was on trial. (Tr. Jan. 15, 1998, at 46.)

There is not a reasonable probability that the result of the trial would have been different if defense counsel had presented an expert witness to rebut the theory that sexual abuse victims repress memories. Therefore, Petitioner has failed to show that his attorney's omissions prejudiced the defense. The state court's conclusion -- that Petitioner was not deprived of effective assistance of counsel -- did not result in a decision that was contrary to, or an unreasonable application of, *Strickland*.

### D. Defense Counsel's Comments at Sentencing

Petitioner's fourth claim alleges that his attorney provided ineffective assistance at sentencing by telling the trial court that Petitioner should assume some responsibility for his predicament. (Tr. Jan. 30, 1998, at 12-13.) The Michigan Court of Appeals concluded that defense counsel's statements did not prejudice him and, therefore, his claim lacked merit. This Court agrees.

Defense counsel's remark was not an argument against leniency, as Petitioner alleges. It was a response to Petitioner's criticism of defense counsel's performance at trial. Although defense counsel's comment did imply that he thought Petitioner was guilty of the charged offenses, the jury had already made that determination, and the trial court stated that defense counsel's comments were consistent with the pre-sentence report and with what the court had observed. The report indicated that Petitioner had no remorse, demonstrated hostility toward the court, his attorney, and the entire legal system, and characterized himself as the victim without showing any consideration for the complaining witness. The trial court agreed with the author of the presentence report that, unless Petitioner began to take some responsibility for his own behavior, there would be no rehabilitation. The trial court refused to follow the sentencing

recommendation because the court thought that the recommendation was extremely light. (*Id*. at 13-14.)

The state appellate court's conclusion -- that defense counsel's performance did not prejudice Petitioner -- was objectively reasonable. Therefore, Petitioner has no right to relief on the basis of his claim about his attorney's representation at sentencing.

### E. Claims V-VI and VIII through X

Petitioner's remaining claims allege that Petitioner was denied his right to represent himself at trial, that the trial court failed to address his motion for a defense expert, and that defense counsel should have presented an alibi defense and admitted medical records as exhibits. Petitioner also alleges that appellate counsel was ineffective for failing to raise these claims on direct appeal. Because Petitioner first raised these claims on state collateral review of his convictions. Respondent argues that the claims are procedurally defaulted.

#### 1. Procedural Default

A procedural default is "a critical failure to comply with state procedural law . . . ." *Trest v. Cain*, 522 U.S. 87, 89 (1997). The state procedural rule in question here is Michigan Court Rule 6.508(D)(3), which prohibits state courts from granting relief from judgment if the defendant alleges nonjurisdictional grounds that could have been raised on appeal from the conviction or sentence.[6] Petitioner first raised habeas claims V, VI, and VIII through X in his motion for relief from judgment and in the subsequent appeals. With the exception of claim X, which alleges ineffective assistance of appellate counsel, Petitioner could have raised his claims on direct appeal from his convictions.

---

[6] An exception exists when the defendant demonstrates "good cause for failure to raise such grounds on appeal" and "actual prejudice from the alleged irregularities that support the claim for relief." Mich. Ct. R. 6.508(D)(3).

The trial court, the Michigan Court of Appeals, and the Michigan Supreme Court rejected Petitioner's claims on the basis of Rule 6.508(D). Their brief orders denying relief under Rule 6.508(D) are a sufficient basis for this Court to conclude that the orders were based on a state procedural bar. *Burroughs v. Makowski*, 282 F.3d 410, 413-14 (6th Cir. 2002). Rule 6.508(D) was an adequate and independent basis for the state court decisions because the rule became effective in 1989, long before Petitioner's convictions and appeal. Consequently, claims V, VI, and VIII through IX are procedurally defaulted. The Court may adjudicate those claims on the merits only if Petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

### 2. "Cause"

Petitioner alleges in claim X that his appellate attorney was ineffective for failing to raise claims V, VI, VIII, and IX on direct appeal. Constitutionally ineffective assistance is "cause" for a procedural default. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

> Appellate counsel is, of course, not required to raise every non-frivolous issue on appeal. "As the Supreme Court has recently observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. In such cases, the petitioner must demonstrate that the issue not presented 'was clearly stronger than issues that counsel did present.' " *Caver v. Straub,* 349 F.3d 340, 348 (6th Cir. 2003) (quoting *Smith v. Robbins,* 528 U.S. 259, 289, 120 S.Ct. 746, 145 L. Ed.2d 756 (2000)) (internal citations omitted); *see also McFarland v. Yukins,* 356 F.3d 688, 710-12 (6th Cir. 2004).

*Franklin v. Anderson*, 434 F.3d 412, 429 (6th Cir. 2006), *cert. denied sub nom Houk v. Franklin*, __ U.S. __, 127 S. Ct. 941 (2007). To determine whether appellate counsel was constitutionally ineffective, the Court will briefly review the underlying claims.

### a. The Right to Represent Oneself

Petitioner alleges in claim V that he was denied his right to represent himself at trial.

Petitioner possessed a constitutional right to represent himself at trial, *Faretta v. California,* 422 U.S. 806, 807 (1975), and he informed the trial court before *voir dire* that he intended to represent himself at trial. However, following a bench conference between the attorneys and the trial court, attorney Howard Arnkoff took over for Petitioner. (Tr. Jan. 2, 1998, at 2-5.)[7] Mr. Arnkoff conducted *voir dire* for Petitioner and performed all the other functions of a trial attorney without any objection from Petitioner. It is obvious that Petitioner changed his mind and decided to let attorney Arnkoff represent him. Counsel's participation is presumed to be with Petitioner's acquiescence, because Petitioner did not expressly and unambiguously renew his request to represent himself when standby counsel took over for him. *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984). Therefore, appellate counsel was not remiss in failing to argue that Petitioner's right to represent himself was violated.

### b. The Failure to Address Petitioner's Motion for an Expert Witness

Habeas claim VI alleges that the trial court failed to address Petitioner's motion for a defense expert. In Michigan, the decision whether to appoint an expert witness for the defense is discretionary with the trial court. *See People v. Tanner,* 469 Mich. 437, 442; 671 N.W.2d 728, 730 (2003). Thus, there is no assurance that the trial court would have appointed a defense expert at county expense if the trial court had adjudicated Petitioner's motion.

There also is not a strong probability that the result of the trial would have been different had the trial court granted Petitioner's motion for an expert. *See infra* section III.C. The expert would not have had any personal knowledge about the complainant and would have been permitted to provide only general information, not an opinion on the complainant's credibility or whether abuse occurred. *People v. Beckley,* 434 Mich. 691, 729; 456 N.W.2d 391,

---

[7] Petitioner alleges that he was not a part of this conference.

407-08 (1990). Furthermore, a defense expert's testimony would have emphasized the importance of the prosecution's expert. The Court concludes that appellate counsel was not ineffective for failing to raise Petitioner's claim about his unaddressed motion for an expert witness.

### c. Failure to Admit Medical Records

The eighth habeas claim alleges that trial counsel was ineffective for failing to present the complainant's medical records as exhibits. The jury asked for the records during their deliberations, and Petitioner alleges that the records would have disproved the complainant's allegations that Petitioner attacked her. The complainant, however, did not have a pelvic examination and did not disclose any sexual abuse to medical personnel. The prosecutor used the medical records to establish an approximate date for the alleged crimes, not to prove that the complainant was penetrated. Because the records would not have helped Petitioner's defense, trial counsel was not ineffective for failing to admit the records, and appellate counsel was not ineffective for failing to raise the claim about trial counsel.

### d. Failure to Present an Alibi Defense

The ninth habeas claim alleges that Petitioner's trial attorney should have presented an alibi defense. Petitioner does not allege where he was on the date in question or how he could have proved an alibi defense. Furthermore, the criminal information stated that the alleged offense occurred sometime during August of 1992. It would have been difficult to present an alibi for the whole month, particularly because the incident was not disclosed until 1997. Additionally, defense counsel stated at sentencing that Petitioner's proposed alibi witnesses were unwilling to testify because they did not see anything, hear anything, or know anything about the alleged incident. (Tr. January 30, 1998, at 9.) Under the circumstances, defense counsel was not ineffective for failing to present an alibi defense, and appellate counsel was not ineffective for

failing to raise the issue on appeal.

For all the reasons give above, Petitioner's fifth, sixth, eight, and ninth claims lack merit and were not clearly stronger than the issues raised on direct appeal. Therefore, appellate counsel's failure to raise the issues was reasonable and affords no basis for concluding that appellate counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *McMeans v. Brigano*, 228 F.3d 674, 683 (6th Cir. 2000). Petitioner's claim about appellate counsel fails as an independent claim. In addition, appellate counsel cannot be deemed "cause" for Petitioner's procedural default.

### 3. Prejudice; Miscarriage of Justice

It is unnecessary to determine whether Petitioner was prejudiced as a result of the alleged constitutional errors, because he has failed to establish "cause" to excuse his procedural default. *Smith v. Murray*, 477 U.S. 527, 533 (1986); *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). The remaining question is whether a miscarriage of justice will occur from the Court's failure to adjudicate the substantive merits of Petitioner's claims.

The narrow exception for fundamental miscarriages of justice requires a habeas petitioner to demonstrate that the alleged constitutional errors probably resulted in the conviction of one who is actually innocent of the underlying offense. *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Murray v. Carrier*, 477 U.S. at 496. "To be credible, such a claim requires [the] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327.

Petitioner has not presented any new evidence to support a claim of actual innocence.

Therefore, a miscarriage of justice will not occur as a result of the Court's failure to consider his procedurally defaulted claims on the merits.

**IV.  Conclusion**

The state appellate court's adjudication of habeas claims I, II, III, IV, and VII did not result in a decision that was contrary to, or an unreasonable application of, Supreme Court precedent.  Petitioner's remaining claims are procedurally defaulted.  Accordingly, the writ of habeas corpus is **DENIED**.

Petitioner's motion to strike [Doc. 59, May 16, 2008] also is **DENIED**.  Although Petitioner alleges that Respondent untimely filed two volumes of the transcript of trial, the transcripts are part of the state record, and the Court needed them to adjudicate Petitioner's claims.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  July 15, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 15, 2008, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager